UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

GERMAINE BLAINE; CYNTHIA
BRYANT; JUAN CASTRO; ASHISH
DALAL; FIRAS MUWALLA;
BRENDAN PRENDERGAST; and
RICHARD SPRAWLS,

    Plaintiffs,

v.

                                                                   Case No. 6:18-cv-487-Orl-37DCI

NORTH BREVARD COUNTY
HOSPITAL DISTRICT,

    Defendant.

## ORDER

Before the Court is Defendant North Brevard County Hospital District, d/b/a Parrish Medical Center's ("**PMC**") Motion for Summary Judgment. (Doc. 137 ("**Motion**").) Plaintiffs responded (Doc. 148), and PMC replied (Doc. 154). On review, the Motion is granted.

### I.    BACKGROUND[1]

This case is about a public hospital's decision to deny seven doctors reappointment of medical privileges and the process it used to get there. Plaintiffs are oncologists

---

[1] The facts recited here are not the actual facts of the case. *See Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006). Rather, they reflect Plaintiff's "best case" — that is, the Court must consider the facts in the light most favorable to Plaintiff. *See Robinson v. Arrugueta*, 415 F.3d 1252, 1257 (11th Cir. 2005); *see also Walker v. City of Riviera Beach*, 212 F. App'x 835, 837 (11th Cir. 2006).

-1-

employed by Health First, a health system based in Brevard County, who practice in Brevard County at various facilities. (Doc. 81, ¶¶ 2, 7.) Each successfully applied for medical privileges at PMC and had been re-appointed every time their terms came up. (*Id.* ¶ 12.) So when it came time to renew in 2017, they followed the same process outlined in PMC's Medical Staff Bylaws ("**Bylaws**"): submitting applications for PMC's CEO George Miktarian to review. (*Id.*; Doc. 33-1, ¶ 9; Doc. 81-1, pp. 33–38 (Bylaws reappointment process).) Dr. Miktarian then transmitted Plaintiffs' applications to the Credentials and Medical Ethics Committee ("**CMEC**"), which sent the applications to PMC's Medical Executive Committee ("**MEC**"). (Doc. 81,¶¶ 21–22.) The MEC reviewed the applications and, on November 21, 2017, provided a favorable recommendation regarding Plaintiffs' reappointment to PMC's Board of Directors ("**Board**"). (*Id.* ¶ 23.) All seemed well; Plaintiffs believed their applications would be approved again. (Doc. 81, ¶ 12; *e.g.*, Doc. 143-4, p. 57:19–23; Doc. 143-7, pp. 82:5–83:3.)

Meanwhile PMC had been seeking renewal of accreditation of their cancer program from the Commission on Cancer ("**CoC**"). This process began in 2016 and involved providing data and working closely with CoC staff, who would do a site visit. (Doc. 143-11, pp. 16:1–15, 40:17–41:2, 51:21–54:12.) When the process started, Plaintiff Dr. Dalal was chair of PMC's Cancer Committee and the representative of Health First. (Doc. 143-4, pp. 40:6–17, 41:6–43:7, 64:20–22.) At the September meeting, PMC's accreditation initiative was discussed and the subject of data came up, specifically that PMC needed data from Health First physicians to complete the accreditation process. (*Id.* at 40:6–17, 41:6–43:7.) Dr. Dalal said he would work on it and at a later meeting reported back that

Nancy Payne, Health First's System Director, was the person to talk to. (*Id.*; Doc. 145-1, pp. 33:24–43:8; Doc. 143-8, p. 14:10–12.) He said he would coordinate with her, and PMC separately reached out to her requesting data. (Doc. 143-4, pp. 40:6–17, 41:6–43:7; Doc. 145-1, pp. 33:24–43:8; Doc. 143-8, pp. 27:1–28:8, 30:12–13, 32:7–12; 34:13–15, 41:17–22, 40:23–41:8 (Payne received emails over two years regarding data and received instructions not to provide certain information to PMC).) PMC didn't get everything they were looking for and continued to reach out to Nancy Payne over the next year, as all data requests were funneled her way. (Doc. 143-8, pp. 41:17–22, 52:5–8, 55:18–56:25, 57:24–58:10, 61:1–63:10, 64:6–65:4, 67:8–25, 75:4–25.) Separately, PMC asked Dr. Bryant for some specific information regarding radiation and she complied. (Doc. 143-2, pp. 100:18–101:19; Doc. 145-4, pp. 33:17–34:18.) Nancy Payne, however, was unresponsive to numerous inquiries PMC made about the data. (Doc. 143-8, pp. 41:17–22, 52:5–8, 55:18–56:25, 57:24–58:10, 61:1–63:10, 64:6–65:4, 67:8–25.)

While this was going on, the composition of PMC's Cancer Committee changed. Dr. Dalal was replaced by Dr. Deligdish, an oncologist in charge of a different practice group, as head of the committee. (Doc. 143-4, pp. 90:13–92:6; Doc. 143-5, pp. 10:4–20, 105:18–24, 124:12–20.) PMC noticed a decline in the amount of patients Plaintiffs treated at PMC, and chalked it up to Plaintiffs' association with Health First, which had its own facilities. (Doc. 145-2, p. 35:7–24; Doc. 33-3, ¶¶ 8–12.) So sometime in September 2017, after learning that PMC's numerous requests for data from Health First were outstanding, Dr. Deligdish phoned several Plaintiffs on PMC's behalf to discuss their association with Health First and mentioned the data requests to some. (Doc. 145-1, pp.

89:24–90:11; Doc. 143-5, pp. 105:4–106:19, 109:8–14.) He met with Dr. Dalal in person. (Doc. 143-5, pp. 105:4–106:19.) At that time, Plaintiff Dr. Muwalla was the medical director of Health First, and on hearing of this data issue, he went to Nancy Payne. (Doc. 143-7, pp. 42:7–9, 43:11–13.) According to Dr. Muwalla, she told him she'd get back to him and couldn't release the data PMC was requesting absent approval from her superiors. (*Id.* at 43:16–24.) Those in charge at Health First decided not to release the data. (*Id.* at 56:16–25.)

Matters came to a head when Plaintiffs sought reappointment. Their employer, Health First, had decided not to comply with PMC's requests for data for re-accreditation purposes. (Doc. 145-3, pp. 18:6–18, 20:24–25:22.) PMC informed the CoC surveyor during the on-site visit of the data issues with Health First, who empathized with PMC's situation and created workarounds for some of the data requests. (Doc. 143-11, pp. 51:21–54:12, 73:10–74:17, 81:19–83:6.) Yet at the time Plaintiffs sought reappointment, there were still outstanding data inquiries from Health First. (*Id.* at 73:10–74:17, 81:19–84:25.) So although the MEC recommended approving Plaintiffs' reappointment, when their applications went to the Board, Dr. Miktarian distributed a memo he had Marsha Richardson, PMC's Director of Oncology Services, prepare that detailed all the times PMC had requested data from Health First, naming Plaintiffs. (Doc. 145-2, pp. 12:1–24, 79:23–81:3; Doc. 145-4, pp. 24:20–25, 87:18–92:2.) He also circulated a draft letter prepared by PMC's legal counsel addressed to each Plaintiff. (Doc. 145-2, pp. 85:1–86:3.) At the meeting, the Board decided to send back Plaintiffs' reappointment applications to the MEC because of these data issues ("**December 4 Meeting**"). (*Id.* at 57:3–8; Doc. 33-2, pp.

2–15.)

The next day, Dr. Miktarian sent each Plaintiff a letter notifying them their refusal to provide data constituted a breach of PMC's Bylaws and could be a reason to deny reappointment. (Doc. 33-2, pp. 16–29 ("**December 5 Letter**").) He gave them five days to turn over any outstanding data and noted that even if they attempted to cure now, their applications could still be denied. (*Id.*)

Plaintiffs went to Health First management with the letters, as they didn't own the data and couldn't individually provide it. (Doc. 143-1, pp. 45:4–49:23; Doc. 143-2, pp. 93:15–99:24; Doc. 143-3, pp. 33:19–22, 41:20–46:1; Doc. 143-3, pp. 44:13–50:8; Doc. 143-7, pp. 57:17–64:3; Doc. 143-9, pp. 20:3–22:18; Doc. 143-10, pp. 59:25–60:3, 78:14–81:18.) Health First decided it would handle the entire situation through its legal department, taking the position that it didn't need to hand over the data as PMC was wrongfully attempting to deny these reappointment applications since Plaintiffs had no clinical issues. (Doc. 33-3, pp. 30–33; Doc. 143-1, pp. 53:12–56:2, 63:18–75:14; Doc. 143-2, pp. 101:22–108:13; Doc. 143-3, pp. 55:2–64:24; Doc. 143-4, pp. 57:7–62:16; Doc. 143-7, pp. 57:17–64:3, 74:2–24; Doc. 143-9, pp. 20:3–22:18, 100:5–19; Doc. 143-10, pp. 82:3–83:22.) Letters were exchanged staking out the parties' respective positions. (Doc. 33-1, ¶¶ 26–31, 33, 35–39; Doc. 33-2, pp. 36–49, 51–62; Doc. 33-3, pp. 30–33, 35–41.)

The MEC met after the Board sent back Plaintiffs' applications to the MEC and discussed Plaintiffs' reappointment. (Doc. 33-2, pp. 31–34.) Plaintiff Dr. Sprawls appeared at the meeting to provide his side of the story: he objected to the revocation of his privileges, the Bylaws didn't permit denial of his reappointment for this data reason, the

provision of data had no bearing on his clinical capabilities, the data requests hadn't been made to him, and he had no control over the data. (Doc. 143-10, pp. 97:4–101:11.) The MEC decided to support the Board if the applications were denied. (Doc. 33-2, p. 33.)

The Board met again and heard Plaintiffs hadn't complied with data requests as Health First was refusing to turn it over. (Doc. 145-1, pp. 67:6–68:6.) At the same time, PMC was working with CoC to get an extension on its time to comply with two outstanding data requests and learning what to do to finish the accreditation process despite this missing data. (Doc. 143-11, pp. 81:19–87:13.) The Board decided to deny Plaintiffs' reappointment applications at the **January 8 Meeting**, and Dr. Miktarian sent each Plaintiff a letter notifying them of the denial and the expiration of their privileges. (Doc. 33-2, pp. 64–77.) He offered them the opportunity to appear before the Board for an interview and appeal the decision as the Bylaws allow. (*Id.*)

Feeling steamrolled, Plaintiffs responded via letter prepared by Health First's counsel. (*Id.* at 79–99.) They initially accepted the interview offer but then didn't respond to Dr. Miktarian's request to provide dates and times, later deciding "to forego" the interview. (*Id.*; Doc. 33-3, pp. 2–28, 43–44, 46–47.) They also didn't send any patient information or attempt to provide coordination of care plans. (Doc. 143-1, pp. 73:20–74:6; Doc. 143-2, p. 122:20–15; Doc. 143-3, pp. 60:2–13, 62:6–15; Doc. 143-7, pp. 72:15–73:3; Doc. 143-9, p. 97:1–12; Doc. 143-10, p. 115:21–25.)

With privileges gone, Plaintiffs filed this lawsuit alleging two claims initially: PMC violated their procedural due process by denying them reappointment without a hearing, and PMC breached the Bylaws by denying the applications for not providing the data,

which Plaintiffs dub a non-clinical business reason. (Doc. 1.) For the breach claim, they say Dr. Miktarian committed intentional fraud by telling the Board Plaintiffs failed to comply with numerous data requests made to them, repeating this in the December 5 Letter, and telling this to the MEC. (*Id.* ¶¶ 18, 24–25, 28–31, 61–62, 64–66.) With the Complaint, Plaintiffs moved for preliminary injunction. (Doc. 5.)

Following briefing and a hearing on the preliminary injunction (Docs. 32, 33, 35, 38, 39), the Court granted the motion in part on the procedural due process claim, ordering PMC to provide Plaintiffs a hearing in conformity with its Bylaws and reinstating Plaintiffs' privileges in the meantime. (Doc. 42 ("**First PI Order**").) PMC complied, holding a hearing on Plaintiffs' reappointment applications in conformity with the Bylaws before a neutral decisionmaker where Plaintiffs were represented by counsel and presented witness testimony and evidence ("**Ad Hoc Committee**"). (Doc. 81-1, pp. 92–96; Docs. 66-4, 66-5 (hearing transcript).) The focus was on the data: whether PMC requested data from Plaintiffs, whether Plaintiffs received data requests, how Plaintiffs responded, should their responses cost them reappointment, whether they provided the data, and whether denial of their reappointment applications was appropriate for not providing the data. (Doc. 81-1, p. 93.)

On consideration, the Ad Hoc Committee issued Findings and Recommendations. (Doc. 81-1, pp. 94–95.) First, the Ad Hoc Committee addressed "the central question—do the Medical Staff Bylaws require [Plaintiffs] to have supplied, or caused to be supplied, the requested data?" (*Id.* at 94.) It found:

> The Physicians are all board-certified oncologists serving on Parrish's Medical Staff.
>
> Parrish has been accredited by the Commission on Cancer for at least 18 years.
>
> The Commission publishes national standards for cancer care and issues accreditation to hospitals and other organizations meeting its standards.
>
> Accreditation by the Commission and the collection of data for Commission accreditation are quality improvement programs that improve the quality of patient care at the hospital.
>
> Until the Commission's most recent survey in 2016, Parrish has always received the Patient Data from the oncologists on its Medical Staff.
>
> From early 2016 through late 2017, Parrish made repeated requests for Patient Data from Nancy Payne, Director, Health First Cancer Institute – the Physicians' employer. Dr. Dalal on several occasions identified Nancy Payne as the contact person for Patient Data requests.
>
> Until 2016, Parrish had always received the requested data from the Physicians. Sometime before 2016, the Physicians became employees of Health First. Since 2016, the Physicians have worked exclusively for Health First.
>
> Physicians do not dispute that Parrish addressed requests for data to the Physicians Employer (Health First), and Physicians were generally aware of these requests. Physicians' Proposed Findings at P 8. Dr. Dalal testified that the Physicians wanted Health First to respond to the Parrish letters requesting the data. *See, e.g.*, Hearing Transcript July 20th 2018 at p. 286, L 10-11.
>
> There is no evidence to determine the reasons why Health First did not respond as Physicians asked.
>
> It is also undisputed from the evidence presented that this data was not provided (with some limited exceptions, *supra* p.105). *See, e.g.*, Hearing Transcript July 19th, 2018 at p. 68, L 14-16; p. 107.

(*Id.* at 94–95.) So the Ad Hoc Committee answered the first question:

> [Plaintiffs] were aware of the unfulfilled requests for Patient Data and even if they did not have control of the data, they had a duty to supply it, or cause it to be supplied, as part of their obligations as staff members of [PMC].

(*Id.* at 96.)

Next, the Ad Hoc Committee asked, "Was denial of [Plaintiffs'] reappointment applications allowed under the Medical Staff Bylaws for the failure to provide the Patient

-8-

Data request?":

> It is undisputed from the evidence presented that the data requested from the Physicians was for the purpose of Parrish maintaining its accreditation with the Commission on Cancer.
>
> The Committee finds that § 2.2 of the Medical Staff Bylaws, and not § 3.2-3, controls this issue. The Medical Staff is required, *inter alia*, to assist the Board "in identifying community health needs… and in implementing programs to meet those needs."
>
> The Committee finds that the Physicians' failure to provide the Patient Data hinders Parrish's cancer program and may cause the loss of its accreditation in the future. The Physicians' failure to provide the Patient Data hinders the delivery of quality patient care at Parrish.
>
> **The Committee answers the second question: We find that, under the Medical Staff Bylaws, clinical competency is not the sole basis for denying applications for reappointment. This Committee finds that: (i) Parrish made requests to the Physicians for the Patient Data; (ii) the Physicians failed to provide, or cause to be provided, the Patient Data; (3) the denial of the Physicians' reappointment to the medical staff is appropriate under the Medical Staff Bylaws based on their failure to provide, or cause to be provided, the Patient Data.**

(*Id.*) The Ad Hoc Committee concluded:

> **Conclusion**
>
> The Committee finds that the Medical Staff Bylaws are unambiguous and that the request for data was within the appropriate scope of Parrish's rights under the Medical Staff By-laws.
>
> The Physicians' did not provide, or cause to be provided, this data.
>
> This provision of such data was within the scope of their obligations under the Medical Staff By-laws.
>
> Accordingly, the Committee finds that the failure to provide the data was an appropriate basis for denying the applications for renewal of privileges.

(*Id.*) Plaintiffs submitted exceptions to the Ad Hoc Committee's recommendation, as to the overall conclusion and several other findings. (*Id.* at 98–101.) Following oral argument, Dr. Miktarian issued a ruling denying Plaintiffs' exceptions (*id.* at 103–107) and then issued his disposition with detailed findings of fact and his decision (*id.* at 109–121.) He concluded that denial of reappointment was appropriate. (*Id.* at 120–21.)

-9-

Plaintiffs appealed Dr. Miktarian's disposition to the Board, which reviewed the record and discussed the issues at a meeting on October 1. (*Id.* at 123–25.) It unanimously voted to affirm Dr. Miktarian's disposition to deny Plaintiffs' applications for reappointment and "found no information that would contravene its January 8, 2018 decision regarding the physicians' reappointment applications." (*Id.* at 125.) With that, Plaintiffs no longer held privileges at PMC.

Plaintiffs did not appeal the Board's decision in state court as the Bylaws allowed. (Doc. 77-6, p. 6.) Instead, they sought leave to file an amended complaint in this case—to bolster their pending claims with facts from the latest proceedings and tack on a substantive due process claim. (Doc. 62.) After this, they moved for a second preliminary injunction to restore their privileges pending trial. (Doc. 67.) Plaintiffs were allowed to file an amended complaint (Docs. 80, 81), and the Court held a hearing on the second preliminary injunction motion. (Docs. 90, 91.) The second go around, the Court denied Plaintiffs' request for a preliminary injunction, finding: (1) Plaintiffs had now received a full panoply of procedural due process; and (2) Plaintiffs had not established a likelihood of success on the merits for their two other claims. (Doc. 94 ("**Second PI Order**").)

With the close of discovery, the parties moved for summary judgment. Plaintiffs seek partial summary judgment on three affirmative defenses (Doc. 136), and PMC seeks summary judgment on all of Plaintiffs' claims (Doc. 137). Briefing complete (Docs. 147, 148, 153, 154), the Court now takes up PMC's fully dispositive motion.[2]

---

[2] The Court need not resolve Plaintiffs' motion for partial summary judgment because, as explained below, Plaintiffs' claims do not survive summary judgment.

## II. LEGAL STANDARDS

Summary judgment is appropriate only if the movant shows that there is no genuine dispute as to any material fact and that [it] is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). As to issues for which the movant would bear the burden of proof at trial, it must affirmatively show the absence of a genuine issue of material fact and support its motion with credible evidence demonstrating that no reasonable jury could find for the nonmoving party on all of the essential elements of its case. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1115 (11th Cir. 1993) (citing *United States v. Four Parcels of Real Prop. in Green & Tuscaloosa Ctys*, 941 F.2d 1428, 1438 (11th Cir. 1991)).

As to issues for which the nonmovant would bear the burden of proof at trial, the movant has two options: (1) it may simply point out an absence of evidence to support the nonmoving party's case; or (2) it may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial." *Four Parcels*, 941 F.2d at 1438 (citing *Celotex Corp.*, 477 U.S. at 325). "The burden then shifts to the nonmoving party, who must go beyond the pleadings and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006) (citing *Fitzpatrick*, 2 F.3d at 1115–17).

"A factual dispute is genuine 'if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Four Parcels*, 941 F.2d at 1437 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A court must view the evidence and all reasonable inferences drawn from the evidence in the light most favorable to the

nonmovant, *Battle v. Bd. of Regents*, 468 F.3d 755, 759 (11th Cir. 2006), such that "when conflict arises between the facts evidenced by the parties, [the] court credit[s] the nonmoving party's version," *Evans v. Stephens*, 407 F.3d 1272, 1278 (11th Cir. 2005). However, "[the] court need not permit a case to go to a jury . . . when the inferences that are drawn from the evidence, and upon which the nonmovant relies, are 'implausible.'" *Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 743 (11th Cir. 1996). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

### III. DISCUSSION

PMC seeks summary judgment on all claims: (1) violating their procedural due process; (2) breach of Bylaws; and (3) violating their substantive due process. (Doc. 137.) The Court addresses each in turn.

#### A. Procedural Due Process

First, PMC argues summary judgment is appropriate on Plaintiffs' procedural due process claims since Plaintiffs received all the process due through the Ad Hoc Committee hearing and Plaintiffs' appeal. (Doc. 137, pp. 18–20.) In response, recognizing the Court already found in the Second PI Order that Plaintiffs had now received all the process that was due, Plaintiffs say their procedural due process claims were complete when PMC terminated their privileges in January 2018 without a hearing. (Doc. 148, pp. 12–13.) PMC is right.

"[A] procedural due process violation is not complete 'unless and until the State fails to provide due process.'" *McKinney v. Pate*, 20 F.3d 1550, 1557 (11th Cir. 1994) (quoting *Zinermon v. Burch*, 494 U.S. 113, 123 (1990)). "In other words, the state may cure a procedural deprivation by providing a later procedural remedy." *Id.* If the matter reaches federal court and "a procedural deficit appears, the matter should, at that point, be remanded to the institution for its compliance with [applicable procedural] standards." *Woodbury v. McKinnon*, 447 F.2d 839, 846 (5th Cir. 1971) (quoting *Ferguson v. Thomas*, 430 F.2d 852, 858 (5th Cir. 1970)).[3] And when the procedures that follow comply with the requirements for procedural due process, "that ordinarily ends the matter." *Id.* (quoting *Ferguson*, 430 F.2d at 858).

Here, the Court finds that the requirements for procedural due process "were met before final disposition of the case." *Id.* As the Court stated in the Second PI Order, Plaintiffs' initial procedural due process claims were promising because their reappointment applications had been denied without a pre-deprivation hearing before a neutral decisionmaker. (Doc. 94, p. 7.) So the Court ordered and PMC provided such process, "in the form of a Bylaws-compliant hearing before a neutral decisionmaker where Plaintiffs were represented by counsel and could present evidence." (*Id.* (citing Doc. 42, pp. 11–16).) "No change in outcome was guaranteed." (*Id.*) And through that hearing, followed by Plaintiffs exhausting the appeal process, Plaintiffs received "the full

---

[3] The decisions of the former Fifth Circuit rendered before October 1, 1981 are binding on this circuit. *Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

panoply of due process protections." (*Id.* at 8 (quoting *Shahawy v. Harrison*, 875 F.2d 1529, 1533 (11th Cir. 1989)).) With all this, Plaintiffs can no longer maintain the position that PMC violated their procedural due process rights. PMC's Motion is granted as to these claims.

**B.     Breach of Bylaws**

Next, PMC seeks summary judgment on Plaintiffs' breach of the Bylaws claims, arguing chiefly that PMC is entitled to statutory immunity under Fla. Stat. § 395.0191(7) because Plaintiffs haven't proved up that PMC acted with intentional fraud. (Doc. 137, pp. 21–24.) In response, Plaintiffs circle back to the argument that their reappointment applications can't be denied under the Bylaws for this data issue, which they argue is unrelated to patient care. (Doc. 148, pp. 13–17.) Plaintiffs then say § 395.0191(7) immunity doesn't apply here because PMC was acting in furtherance of business interests; and even if it does, whether Dr. Miktarian committed intentional fraud is a jury issue. (*Id.* at 17–20.) PMC's immunity argument carries the day.

> Fla. Stat. § 395.0191(7) provides:
>
> There shall be no monetary liability on the part of, and no cause of action for injunctive relief or damages shall arise against, any licensed facility, its governing board or governing board members, medical staff, or disciplinary board or against its agents, investigators, witnesses, or employees, or against any other person, for any action arising out of or related to carrying out the provisions of this section, absent intentional fraud.

This "immunizes [any] hospital against any action for monetary or injunctive relief if it arises out of, or is related to, the appointment or reappointment process absent intentional fraud." *Lawnwood Med. Ctr., Inc. v. Desai*, 54 So. 3d 1027, 1031 (Fla. 4th DCA

-14-

2011).⁴ "To demonstrate intentional fraud, a plaintiff must show that the defendant made a misrepresentation about a material fact, and that the defendant knew the statement to be false." *Uche v. St. Lukes-St. Vincent Healthcare, Inc.*, No. 3:12-cv-865-J-32JBT, 2015 WL 476178, at *12 (M.D. Fla. Feb. 5, 2015) (first citing *Pierson v. Orlando Reg'l Healthcare Sys., Inc.*, No. 6:08-cv-466-Orl-28GJK, 2010 WL 1408391, at *8 (M.D. Fla. Apr. 6, 2010), *aff'd*, 451 F. App'x 862 (11th Cir. 2012); then citing *Myers v. Myers*, 625 So. 2d 1214, 1215 (Fla. 5th DCA 1995)).

Here, Plaintiffs latch intentional fraud onto Dr. Miktarian's conduct at the December 4 and January 8 Meetings, specifically when Dr. Miktarian informed the Board that Plaintiffs hadn't complied with numerous data requests and that this non-compliance jeopardized PMC's accreditation renewal.⁵ (Doc. 148, pp. 4–8, 19.) Yet the evidence, viewed in Plaintiffs' best light, neither supports Plaintiffs' assignment of intentional fraud nor presents a genuine dispute of material fact.

First, Plaintiffs say Dr. Miktarian's statements to the Board that PMC had

---

⁴ As an initial matter, the Court finds PMC may invoke § 395.0191(7) immunity over its denial of Plaintiffs' reappointment applications because, as stated in the Second PI Order, "the Bylaws allow issues outside the realm of clinical competence to be considered when evaluating a staff member's reappointment application," such as demonstrated professional ability and clinical judgment, professional ethics, discharge of staff obligations, and compliance with the Bylaws. (Doc. 94, pp. 5–6.) This echoes criteria § 395.0191(4) lists for determining a staff member's eligibility for privileges. Since Plaintiffs' claim is borne out of PMC's evaluation of their reappointment applications, § 395.0191(7) applies.

⁵ In the Amended Complaint, Plaintiffs alleged Dr. Miktarian committed intentional fraud before the MEC also (Doc. 81, ¶¶ 28–31), but neither bring this up nor point to evidence in their Response to support this allegation (*See* Doc. 147, p. 19). Either way, the Court finds the record doesn't support this allegation.

requested data from them is false and constitutes intentional fraud. (*Id.* at ¶ 2, p. 19.) Yet all Plaintiffs admitted in their depositions that they had been informed and/or asked about Health First providing PMC data for accreditation purposes before the December Board meeting. (Doc. 143-1, pp. 45:18–25, 54:6–56:2 (Dr. Blaine provided data when asked, knew Health First was asked many times for data); Doc. 143-2, pp. 94:16–95:25 (Dr. Bryant had been asked for data and complied with request); Doc. 143-3, pp. 34:8–11, 35:4–39:1, 40:3–15 (Dr. Castro was contacted by Dr. Deligdish for the data, Dr. Castro then talked to Nancy Payne); Doc. 143-4, pp. 26:14–25, 32:23–33:17, 35:4–37:11, 50:22–53:11 (Dr. Dalal knew about data being requested as part of reaccreditation, had conversations with Nancy Payne about providing the data); Doc. 143-7, pp. 28:17–29:3, 31:18–32:1, 40:1–42:6, 42:7–9, 43:11–24, 44:6–25, 46:6–25, 47:8–57:12 (Dr. Muwalla spoke to Dr. Deligdish and was told about PMC requesting data for COC accreditation, Dr. Muwalla then spoke to Nancy Payne and sent an email to Plaintiffs to not share the data, he got an email in November from Marsha Richardson at PMC contacting Nancy, Health First decided to involve legal); Doc. 143-9, pp. 57:10–58:13 (Dr. Prendergast had known about data from speaking with Dr. Deligdish and Dr. Dalal, he responded to Dr. Deligdish by identifying Nancy Payne); Doc. 143-10, p. 69:7–25 (Dr. Sprawls knew about PMC's data requests to Health First).) So Plaintiffs' own testimony refutes their contention that Dr. Miktarian "spoke falsely and with malice . . . when he advised PMC's Board that multiple requests for reaccreditation data were made to Physicians." (Doc. 148, p. 19.) As such, their assignment of intentional fraud on these grounds is baseless.

Next, Plaintiffs point to Dr. Miktarian's statements that PMC's accreditation was

-16-

in jeopardy as evidence of intentional fraud because the CoC had been working with PMC to resolve its deficiencies. (*Id.* at 7–8, 19.) This assertion is unsupported by the record, which actually reveals that PMC fought tooth and nail to gain re-accreditation and succeeded despite this missing data. PMC worked with the CoC's surveyor to brainstorm and create workarounds to get at this missing data from another angle, via records it could obtain. (Doc. 143-11, pp. 40:17–41:2, 51:21–54:12, 73:10–74:17, 77:1–79:14, 81:19–84:25 (deposition of Vicki Chiapetta describing PMC's re-accreditation process).) And although PMC was able to resolve some deficiencies before the Board ultimately voted to deny Plaintiffs' reappointment applications, there were still two outstanding deficiencies PMC didn't resolve until two months later—one of which specifically required information on Health First policies and procedures. (*Id.* at 86:8–87:13, 94:1–99:24.) At the end of the day though, none of this changes the fact that PMC needed that data and not being able to get it jeopardized PMC's re-accreditation. (*Id.* at 134:2–135:5, 137:22–138:3, 144:23–156:25; Doc. 145-1, pp. 63:4–65:20.) Plaintiffs' evidence shows PMC didn't take no for an answer and still endeavored to obtain re-accreditation. But PMC's success doesn't mean the refusal to provide data didn't undermine and obstruct this process. Thus, Dr. Miktarian's statements to the Board linking the missing data to PMC's re-accreditation does not demonstrate intentional fraud.

With that, Plaintiffs have failed to provide evidence of intentional fraud in connection with the denial of their reappointment applications to supplant PMC's statutory immunity under Fla. Sta. § 395.0191(7). Accordingly, PMC is entitled to statutory immunity for Plaintiffs' breach of the Bylaws claims. The Motion is granted on

these grounds.

## C. Substantive Due Process

Last are Plaintiffs' substantive due process claims that "condition[ing] renewal of privileges on furnishing reaccreditation data requested by PMC" was unreasonable and arbitrary because supplying the data was not within Plaintiffs' control and unrelated to Plaintiffs' individual abilities and the provision of quality patient care. (Doc. 148, p. 20.) But when it comes to a substantive due process claim, as the Court explained previously, the Court cannot "substitute [its] judgment for that of the hospital's governing board or . . . reweigh the evidence regarding the renewal or termination of medical staff privileges." (Doc. 94, p. 6 (quoting *Shahawy*, 875 F.2d at 1533).) Rather:

> [T]he court is charged with the narrow responsibility of assuring that the qualifications imposed by the Board are reasonably related to the operation of the hospital and fairly administered. In short, so long as staff selections are administered with fairness, geared by a rationale compatible with hospital responsibility, and unencumbered with irrelevant considerations, a court should not interfere.

(*Id.* at 6–7 (quoting *Shahawy*, 875 F.2d at 1533).)

Like before, PMC's decision to deny Plaintiffs' reappointment applications because they failed to turn over, or cause to be turned over, the data requested for accreditation purposes clears this bar. (*See id.*); *see also Woodbury*, 447 F.2d at 845–846. Unlike the case Plaintiffs cite, *Foster v. Mobile County Hospital Board*, where the doctors' staff privileges were conditioned on their membership in an unrelated medical society and ability to curry favor with staff members, PMC denied Plaintiffs' reappointment applications after providing Plaintiffs the opportunity to rectify the situation. *See* 398 F.2d

227, 229–30 (5th Cir. 1968); (Doc. 148, p. 20; Doc. 33-2, pp. 16–29 (December 5 Letter).) No Plaintiff did. Instead, they took the issue up the chain of command at Health First, who staunchly refused to turn over the data and decided to treat this as a "legal issue." (Doc. 143-1, pp. 69:10–20; 70:16–72:18; Doc. 143-2, pp. 106:17–108:13; Doc. 143-4, pp. 59:11–60:24; Doc. 143-4, pp. 49:8–50:3, 57:24–58:5; Doc. 143-7, pp. 62:5–63:15; Doc. 143-8, p. 84:16–20; Doc. 143-9, p. 22:2–18.) Things escalated, and it became pellucid that the data wouldn't be turned over. (Doc. 33-2, pp. 30–99; Doc. 33-3, pp. 1–41.) So PMC denied Plaintiffs' reappointment, finding the repeated failure to provide data abrogated the Bylaws. (Doc. 33-2, pp. 64–77.)

While not a named party in this proceeding, at bottom, this dispute revolves around the thinly veiled effort of Health First to flex its muscle in the long running, heavily litigated, "scorched earth" turf war for Brevard County's healthcare business. The plaintiff physicians here, all imminently qualified in the field of oncology, have been employed as foot soldiers in the intractable hostilities. Whether Health First has any concern for the reputation of their employee physicians, or the unfettered delivery of health care services to Brevard County citizens, or simply regards this as unfortunate but necessary collateral damage is unclear. No sacrifice is too great when it's not yours.

Applying the Court's "narrow" scope of review to this decision, PMC's grounds for denial were "reasonably related the operation of the hospital," "fairly administered," "geared by a rationale compatible with hospital responsibility," and relevant to their pending applications. *See Shahawy*, 875 F.2d at 1533. In short, PMC's decision complies with substantive due process, and the Court cannot disturb PMC's judgment. *See id.*

Therefore, PMC's Motion is granted for these claims.

### IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** as follows:

1. Defendant North Brevard County Hospital District d/b/a Parrish Medical Center's Dispositive Motion for Summary Judgment and Incorporated Memorandum of Law (Doc. 137) is **GRANTED**.

2. The Clerk is **DIRECTED** to enter judgment in favor of Defendant North Brevard County Hospital District and against Plaintiffs Germaine Blaine, Cynthia Bryant, Juan Castro, Ashish Dalal, Firas Muwalla, Brendan Prendergast, and Richard Sprawls on all counts of the Amended Complaint (Doc. 81).

3. All other pending motions are **DENIED AS MOOT**.

4. The Clerk is **DIRECTED** to terminate any deadlines and close the file.

**DONE AND ORDERED** in Chambers in Orlando, Florida, on August 22, 2019.



ROY B. DALTON JR.
United States District Judge

Copies to:
Counsel of Record